Melville H. Smith, Jr. and Margaretta A. H. Smith, Appellants, *v.* Commonwealth of Pennsylvania, Department of Transportation, Appellee.

Argued April 8, 1976, before Judges CRUMLISH, JR., MENCER and ROGERS, sitting as a panel of three.

*William D. March,* for appellant.

*Michael L. Brint,* Special Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE ROGERS, June 4, 1976:

The history of this litigation is almost as complex and certainly as ill-starred as that of the Blue Route by which it was begotten.[1] There is presently before us the appeal of landowners, Melville H. Smith, Jr. and Margaretta A. Smith, his wife, from an order of the Court of Common Pleas of Delaware County denying a prayer of the petition for leave to file nunc pro tunc preliminary objections to a Declaration of Taking filed by the Commonwealth of Pennsylvania by its Department of Transportation (PennDOT). The landowners say that the lower court abused its discretion by not extending the time for filing preliminary objections.

It becomes necessary to describe the history in some detail. In 1945 Mr. and Mrs. Smith purchased a lot containing 4.440 acres of land, exclusive of the right-of-way of township road, located in Nether Providence Township. The lot was improved with a two and one-half story frame and stone house, designed by a notable local architect and containing, in

---

[1] The name Blue Route was given to that alignment finally chosen by public authorities for a proposed multi-lane super highway link between a point on the Industrial Highway in Delaware County near the Philadelphia International Airport and the Pennsylvania Turnpike at King of Prussia. As inhabitants of southeastern Pennsylvania know, although many properties were acquired and some segments of the highway constructed, the Blue Route more than a decade later remains unfinished and embroiled in controversy.

addition to common rooms, seven bedrooms, three bathrooms and a powder room, and with two out-buildings, one a horse stable and the other a three car garage. The property was the Smith family residence after 1945; they kept as many as six horses for their personal use; and Mr. Smith conducted two busi-nesses, one a mail order enterprise and the other a banking advisory service, on the property.

In or before the year 1968 representatives of PennDOT told the Smiths that 1.860 acres of their land, including the portion on which all of the build-ings were located, would be required for construction of the Blue Route. In April 1969,[2] after negotiations, the Smiths executed and delivered to PennDOT two written agreements on forms provided and prepared by the Commonwealth's then Department of High-ways, since renamed the Department of Transporta-tion. The first is denominated "Agreement (Ad-vance Payment)" which after reciting that the Smiths own the property affected by the construction of the Blue Route, that the Commonwealth requires a por-tion thereof, that the parties are unable to agree as to the amount of just compensation due the Smiths, and that the Smiths are "desirous of relinquishing pos-session . . . and of receiving payment of the Common-wealth's estimate of just compensation, without preju-dice to [their] right to further review by the Common-wealth of the damages [they] are or may be entitled to receive and without prejudice to [their] right to petition the courts to assess the amount of such dam-ages," contains the following pertinent operative provisions:

"1. The COMMONWEALTH will condemn the prop-erty described in Exhibit A, and the OWNER will there-

---

[2] One of the two documents herein mentioned was acknowledged by the Smiths on April 16, 1969, the other is dated April 21, 1969.

after execute a confirmatory deed in fee simple covering the said property.

"2. Within sixty (60) days of the execution of this agreement the COMMONWEALTH will pay to the OWNER the sum of fifty-seven thousand, five hundred dollars (no cents) ($57,500.00) Dollars, representing the COMMONWEALTH's estimate of just compensation for said premises. This payment will be made as a payment pro tanto and shall in no way be construed as affecting the OWNER's right to further review by the COMMONWEALTH of the damages the OWNER is or may be entitled to receive and without prejudice to the OWNER's right to petition the Courts to assess the amount of such damages.

"3. The OWNER will deliver possession of the premises described in Exhibit A attached hereto and agrees that five thousand, seven hundred and fifty dollars (no cents) ($5,750.00) Dollars of the said sum may be withheld by the COMMONWEALTH until possession has been delivered. Prior to delivery of possession the OWNER will terminate all leases or other agreements, including but not limited to those relating to outdoor advertising devices, relating to the property described in Exhibit A, where the OWNER has the right to do so.

"4. Loss or damage to the property by fire or other casualty shall be at the risk of the OWNER until possession of the property has been delivered to the COMMONWEALTH. The OWNER may continue to insure the property after possession has been delivered until title has passed to the COMMONWEALTH. If any building(s) are being acquired by the COMMONWEALTH under this agreement, any insurance policy(ies) on such building(s) shall be amended to provide for payment thereunder (by means of a standard mortgage clause) to the COMMONWEALTH of the amount paid to the OWNER under paragraph 2."

The second agreement, also on a Commonwealth, Department of Highways form, is called "Building Removal Agreement" which, after reciting that the Commonwealth has "entered into an agreement to condemn the property", that the Commonwealth "will acquire an easement for highway purposes from the property", and that the Commonwealth is agreeable to the retention by the Smiths of the dwelling house, provided that the Commonwealth receives credit for the value of the dwelling as severed in settlement of the Smiths' claim for damages, contains the following operative provisions:

"1. The OWNER will on or before October 31, 1969 remove from the area to be condemned the following buildings:

(a) Single family three story detached residential dwelling.

"2. The OWNER agrees:

☐ To pay to the COMMONWEALTH at the signing of this agreement the sum of      in full consideration of the aforesaid buildings.

☒ To credit against his right of way damage claim the sum of $2,000.00, in full consideration of the aforesaid buildings.

☐ To credit against his right of way damage claim the fair market value of the aforesaid buildings as severed from the real estate.

"3. The OWNER agrees that $1,000.00 of the monies which shall be due him from the COMMONWEALTH on account of his right of way damage claim shall be withheld by the COMMONWEALTH until the OWNER has removed the aforesaid buildings from the condemned area. In the event the OWNER shall fail to remove the said buildings by the date specified in Paragraph 1, above, the OWNER agrees to deliver possession of the improvements to the COMMONWEALTH, whereupon the COMMONWEALTH shall have the right to

remove and/or demolish the improvements. Upon the OWNER's failure to deliver possession of the buildings, the OWNER agrees that a Writ of Possession shall issue. Any and all costs of removal, demolition, and/or obtaining and serving a Writ of Possession shall be chargeable against the amount withheld.

"4. The OWNER agrees to assume full responsibility for any and all damages to persons or property which may be caused by him or his agents or employes in the removal of the aforesaid building(s), and to hold the COMMONWEALTH harmless from any liability attributable to such damages. The OWNER agrees, further, to require any contractor employed by him to remove the aforesaid building(s) to furnish to the COMMONWEALTH a Certificate of Insurance as required by Highway Specifications Form 4258A."

In April or May of 1969 the Smiths purchased a new dwelling house. They moved from the Nether Providence Township property on September 1, 1969. On or about September 5, 1969 the parties attended a settlement at the office of a title insurance company at which the Commonwealth paid the title company $57,500 and the title company, after deduction of $2000 as the agreed credit for the dwelling house, and retaining $5750 as escrow for delivery of possession, as provided by the "Agreement (Advance Payment)" and $1000 as provided by the "Building Removal Agreement", paid the balance to or for the use of the Smiths. Sometime after September 1, 1969, but before October 31, 1969, the Nether Providence residence was badly damaged by fire. In any event, the Smiths at a cost of $3000 had the home demolished and delivered possession of their property in accordance with the April 1969 written agreements.

One other thing happened in September 1969—the Smiths sold the 2.580 acres not proposed to be condemned by PennDOT for $44,300.

*PennDOT did not file a Declaration of Taking until March 3, 1970,* on which date, as the result of the events described above, the buildings had been removed and the Smiths had sold the land not agreed to be taken by PennDOT. On August 28, 1970 the Smiths filed a petition for the appointment of a Board of View in which they averred that the property condemned was a two and one-half story dwelling, a one-story frame garage and a one-story barn located on 1.860 acres. The Board met on May 3, 1971. Penn-DOT's evidence consisted of the testimony of a valuation expert who, obviously relying on advice of Penn-DOT's legal advisors, said that the subject of the condemnation effected by the Declaration of Taking was an unimproved lot containing 1.860 acres, worth in his opinion $21,400. He ventured the alternative proposal of placing a value of $51,000 on the 4.440 acres originally owned by the Smiths, without improvements, which, after deduction of $44,300 received by the sale of 2.580 acres, indicated a value of only $6700 for the land taken by PennDOT. It was, and apparently remains PennDOT's unpalatable theory that, although it had agreed in April 1969, when the property was in pristine condition, that the Smiths should receive $57,500 as estimated just compensation only and should retain their right to an assessment of damages as provided by law but should remove the dwelling house and deliver possession by October 31, 1969, the subject of the proceeding was only the unimproved lot owned by the Smiths on March 3, 1970. PennDOT says that since that was then worth less than $57,500, it owes nothing more.

The Smiths' theory at the Board of View hearing was that although the Declaration of Taking was not filed until March 3, 1970, their property should be considered and valued as being in the condition it was when the April 1969 agreements were entered into—

that is, as a lot containing 4.40 acres with house and outbuildings extant. On this basis, both Mr. Smith and an expert valuation witness testified to a before value of $125,000 which, after deducting the $44,300 received by the sale of the 2.5 acres not taken, produced total damages of $81,000, which in turn after crediting $57,500 paid as estimate just compensation, produced warrant for an award of $23,500.

The Board of View rejected PennDOT's theory and awarded the Smiths $15,000 in general damages. PennDOT appealed the Board of View's report by the following document:

"AND Now, March 13, 1972, the Commonwealth of Pennsylvania, Department of Transportation, does hereby appeal from the Viewers' Report in the above-entitled case filed March 6, 1972, to No. 2176 Term, 1970 in accordance with the provisions of Act No. 6, Special Sessions, dated June 22, 1964, Article V, Section 516:

"1.   The property involved in this action is situate at Legislative Route 1010, Section A-2, Delaware County, Pennsylvania between said stations 161 + 86 to 164 + 9 and 161 + 30 to 162 + 12.

"2.   The interest of the condemnee in the aforesaid property is ownership in Fee Simple.

"3.   Jury trial is demanded."

As is apparent, no objections other than an unexpressed objection to the amount of the award to the viewer's report appeared in PennDOT's appeal— specifically no objection was made to the Board of View's express determination that PennDOT had taken land and a *residence*. Since this case must apparently be tried in the court below, we note that Section 516 of the Eminent Domain Code, Act of June 22, 1964, Special Sess., P. L. 84, *as amended*, 26 P.S. §1-516, provides that appeals shall set forth objections, if any, to the viewers' report, other than to the amount

of the award, and Section 517, 26 P.S. §1-517, provides that all objections, other than to the amount of the award, raised by the appeal shall be determined by the court preliminarily. In *Kellman Trust Fund v. Commonwealth, Department of Transportation*, 24 Pa. Commonwealth Ct. 102, 354 A. 2d 583 (1976), Judge MENCER writes at length on the matter of Section 516 objections. One holding of that case is that the failure to raise an objection in a Section 516 appeal paper will not preclude the appellant from raising such objection at the trial de novo.

On February 28, 1972, we filed our Opinion and Order in *Nelis v. Redevelopment Authority of Allegheny County*, 4 Pa. Commonwealth Ct. 533, 287 A. 2d 880 (1972), holding that a landowner wishing to establish that a de facto taking had occurred at some date other than the date of the filing of a Declaration of Taking must file preliminary objections to the Declaration pursuant to Section 406 of the Eminent Domain Code, 26 P.S. §1-406. Smiths' counsel seems not to have been apprised of this holding until July 1973 when he filed a petition for rule to show cause why his clients should not be allowed to file preliminary objections to the Declaration of Taking filed on March 3, 1970. The purpose of the proposed preliminary objections is to obtain a decision that a de facto taking occurred in April 1969 before the dwelling house and other improvements were removed in compliance with the agreements then made. Section 406 of the Eminent Domain Code, 26 P.S. §1-406, provides that preliminary objections shall be filed within thirty (30) days after service of a notice of condemnation but that the court, upon cause shown, may extend the time for filing. After hearing, the court below, noting that *Nelis* was decided more than a year prior to the filing of the petition, discharged the rule and denied the prayer of the petition. The Smiths' appeal from

this order is what is now before us. The appellants, without providing any excuse for making their application at a time so long after the filing of the Declaration and the filing of our opinion in *Nelis*, say nevertheless that the unfairness in these circumstances of the Commonwealth's contention that the subject of the suit should be damages to an unimproved lot provides cause for extending the filing date. Assuming that their apparent fear that at the trial a court may rule that the property must be appraised in the condition it was March 3, 1970 is justified, such a consideration does not, in our opinion, provide cause for permitting this filing at this late date. As the court below properly noted, PennDOT bore no responsibility for the delay in filing preliminary objections and the court's refusal to permit such filing was not an abuse of its discretion. We will, therefore, affirm its order here appealed from.

The purpose of our recital of the history of the case is to state here that, despite the failure of the Smiths to file preliminary objections to the Declaration of Taking, we discern nothing contrary to law in submitting the case to the jury on the basis that, although the formal taking was on March 3, 1970, the property's before value should be ascertained with reference to its condition in April 1969, and that we think it should be so submitted. It is clear that by the agreements entered into in April 1969, the parties intended that damages should be so assessed regardless of the date in the future PennDOT might file a Declaration of Taking, including a date after the Smiths, in compliance with those agreements, had removed the dwelling house and after PennDOT, having obtained possession on October 31, 1969, had removed the outbuildings.[3]

---

[3] In a final reference to the Eminent Domain Code, we note that it contains no provision for the payment of estimated just com-

We are told that the Smiths received a substantial sum of money from their insurance company for the fire damages to their house and that PennDOT has brought suit for all or part of this money, contending that the Smiths have been unjustly enriched. The fact of the receipt by the Smiths of this money may have impelled PennDOT, unsure of its entitlement to share in them, to adopt what appears to us to be the specious position that the Smiths should not be compensated for the improvements removed from the property by agreement of the parties. In any case, the matter of the insurance proceeds must be decided in the other suit, where the parties can explain the meaning and effect on this issue of the agreements of April 1969 and their actions thereafter.

Order affirmed.

Judge KRAMER did not participate in the decision in this case.

pensation before the filing of a Declaration of Taking. See Section 407, 26 P.S. §1-407. The record contains no explanation for Penn-DOT's reversal of the procedure authorized by the Code.